## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRACY HINSON,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )         Civil Action No. 19-1782-SRF
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )

## MEMORANDUM OPINION[1]

### I.    INTRODUCTION

Plaintiff Tracy Hinson ("Hinson") filed this action on September 23, 2019 against the

defendant Andrew Saul, the Commissioner of the Social Security Administration (the

"Commissioner").  Hinson seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's July 30, 2019 final decision, denying Hinson's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434.

Currently before the court are cross-motions for summary judgment filed by Hinson and the

Commissioner.[2]  (D.I. 12; D.I. 15)  Hinson asks the court to remand her case for further

administrative proceedings.  (D.I. 13 at 17)  The Commissioner requests the court affirm the

Administrative Law Judge's ("ALJ") decision.  (D.I. 16 at 16)  For the reasons set forth below,

---

[1] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment and the case was assigned to the undersigned judicial officer on February 21, 2020.  (D.I. 14)

[2] The briefing for the present motions is as follows:  Hinson's opening brief (D.I. 13) and the Commissioner's combined opening brief in support of his motion for summary judgment and answering brief (D.I. 16).  Hinson stands upon her opening brief.  (D.I. 17)

the court recommends DENYING Hinson's motion for summary judgment (D.I. 12) and

GRANTING the Commissioner's cross-motion for summary judgment (D.I. 15).

## II.    INTRODUCTION

### a.  Procedural History

Hinson filed a DIB application on September 6, 2016, claiming a disability onset date of

December 10, 2015.  (D.I. 9-6 at 5-6)  Her claim was initially denied on December 5, 2016, and

denied again after reconsideration on February 3, 2017.[3]  (D.I. 9-4 at 6-9, 11-15)  Hinson then

filed a request for a hearing, which occurred on October 24, 2018.  (D.I. 9-2 at 38-60)

Administrative Law Judge Anthony Reeves issued an unfavorable decision, finding that Hinson

was not disabled under the Act, on November 21, 2018.  (D.I. 9-2 at 23-32)  The Appeals

Council subsequently denied Hinson's request for review on July 30, 2019, rendering the ALJ's

decision the final decision of the Commissioner.  (D.I. 9-2 at 4-7)

On September 23, 2019, Hinson brought a civil action in this court challenging the ALJ's

decision that she was not under a disability within the meaning of the Act from December 10,

2015, through November 21, 2018, the date of the ALJ's decision.  (D.I. 2)  On February 7,

2020, Hinson filed a motion for summary judgment, and on March 9, 2020, the Commissioner

filed a cross-motion for summary judgment.  (D.I. 12; D.I. 15)

### b.  Medical History

Hinson was born on July 7, 1963, and was 53 years old on her alleged disability onset

date.  (D.I. 9-3 at 2)  Hinson graduated from high school.  (D.I. 9-2 at 31)  Hinson has past

---

[3] The ALJ noted that Hinson's claim was denied after reconsideration on January 30, 2017, but
the denial is dated February 3, 2017.  (D.I. 9-2 at 23; D.I. 9-4 at 11-15)

relevant work history as a station agent.  (*Id.* at 56)  The ALJ concluded that Hinson has the following severe impairments:  depression and anxiety.  (D.I. 9-2 at 25)

In December 2015, Hinson experienced bullying and harassment while working as a station agent for the New York City Transit Authority.  (D.I. 9-7 at 2)  On December 11, 2015, Hinson visited Alexis Perez, PA ("Ms. Perez") and described severe sweating, tremors, headaches, and stomachaches.  (D.I. 9-11 at 63)  She denied any suicidal ideation.  (*Id.*)  On December 14, 2015, she visited Dr. Ethan Suley ("Dr. Suley") and complained of headaches and anxiety.  (D.I. 9-7 at 20)  Eight days later, she returned to Dr. Suley and reported nervousness, irritability, and several episodes of panic attacks.  (*Id.* at 22)

On February 9, 2016, Hinson visited Dr. Suley and stated that she was experiencing panic attacks.  (*Id.* at 24)  On March 1, 2016, she returned to Dr. Suley, who noted her extreme fatigue and diagnosed her with bipolar disorder.  (*Id.* at 27)  Three days later, Hinson visited Dr. Krystel Salandanan ("Dr. Salandanan")[4] for a psychological evaluation and consultation.  (*Id.* at 2)  Hinson recounted the harassment she experienced at work and described feeling unsafe, alone, and alienated.  (*Id.*)  Dr. Salandanan noted Hinson's cooperative and guarded nature and depressed and anxious mood.  (*Id.*)  Hinson was fully oriented, had a good general fund of information, demonstrated good abstract reasoning ability, and admitted passive suicidal ideation.  (*Id.*)  On the same day, Hinson completed a Workers' Compensation Patient Intake Form, wherein she described being immobile on a regular basis, being constantly afraid, having difficulty sleeping, and experiencing headaches due to anxiety.  (D.I. 9-11 at 5)  She was irritable, easily fatigued, seclusive, prone to crying spells, argumentative, fearful, and less

---

[4] Dr. Salandanan is a clinical psychologist who treated Hinson from April 2016 to June 2018. (D.I. 9-10 at 4-48)

motivated.  (*Id.* at 7)  Hinson experienced depressed moods and flashbacks and nightmares of the incident of harassment at work.  (*Id.*)  On March 28, 2016, she visited Dr. James Cosgrove ("Dr. Cosgrove"), who noted her anxiety, depression, and insomnia.  (D.I. 9-8 at 27)

On April 1, 2016, Dr. Salandanan noted that Hinson experienced growing paranoia and anxiety and increased hypervigilance.  (D.I. 9-10 at 4)  Dr. Salandanan encouraged Hinson to use relaxation techniques and reality checking strategies to reduce her anxiety.  (*Id.*)  Hinson continued treatment with Dr. Salandanan from April 2016 through June 2018 to process her conflict with her employer, social withdrawal, and distrust of others.  (*Id.* at 4-48)  On April 11, 2016, Hinson visited Dr. Jan Gavis ("Dr. Gavis"), who observed her normal mood and affect. (D.I. 9-8 at 25)

On September 17, 2016, Hinson completed a function report, wherein she described her anxiety, depression, and inability to "think straight."  (D.I. 9-6 at 26)  She stated that she has no regular routines, cannot work outside the home, and does not have energy to complete personal care tasks.  (*Id.* at 27)  She required reminders to take care of personal needs and encouragement to complete household tasks.  (*Id.* at 28)  She stated that she cannot drive, but rides in a car or uses public transportation weekly for groceries.  (*Id.* at 29)  She indicated that she can go out alone and that she has problems getting along with family, friends, and neighbors.  (*Id.* at 29, 31) Hinson described difficulties with memory, completing tasks, concentration, understanding, following instructions, getting along with others, and handling stress.  (*Id.* at 31-32)  She noted that she experiences fear often and was a "prisoner in [her] own home."  (*Id.* at 32)

On October 28, 2016, Hinson attended a consultative examination with Dr. Frederick Kurz ("Dr. Kurz"),[5] who completed a psychological functional capabilities evaluation form, wherein he noted her moderately severe ability to:  (1) relate to people, (2) sustain work performance and attendance in a normal work setting, and (3) cope with pressures of ordinary work.  (D.I. 9-7 at 8-9)  He opined that Hinson's anxiety had the potential to affect her ability to function in a work setting.  (*Id.* at 9)  On the same day, Dr. Kurz also completed a mental health report, wherein he noted that Hinson's receptive and expressive language skills were intact.  (*Id.* at 11-12)  Hinson was able to follow directions and answer questions, had no indications of any thought disorders, and was oriented to person, place, and time.  (*Id.* at 12)  She was courteous and cooperative despite appearing anxious.  (*Id.*)  Dr. Kurz acknowledged that Hinson's higher cognitive skills, including abstract reasoning, funds of knowledge, and memory, were intact.  (*Id.* at 13)

On November 5, 2016, Dr. Christopher King ("Dr. King")[6] opined that Hinson had the residual functional capacity ("RFC") to perform her past relevant work.  (D.I. 9-3 at 6-8)  On December 19, 2016, Dr. Salandanan completed a psychological evaluation and consultation, wherein she noted Hinson's good general fund of information and abstract reasoning ability, despite her anxious mood.  (D.I. 9-10 at 54)  Dr. Salandanan observed that there was no evidence of Hinson having a thought disorder or suicidal ideation.  (*Id.*)  Hinson stated that she was unhappy, unfulfilled, anxious, and depressed.  (*Id.* at 55-56)  Dr. Salandanan opined that Hinson's mental health would improve with continued psychological treatment.  (*Id.* at 56)

---

[5] Dr. Kurz is a psychologist who saw Hinson in October 2016 before completing a psychological functional capabilities evaluation form and a mental health report.  (D.I. 9-7 at 8-13)
[6] Dr. King is a state agency medical consultant.  (D.I. 9-3 at 2-9)

On January 29, 2017, Dr. Alex Siegel ("Dr. Siegel")[7] concluded that Hinson had the RFC to complete past relevant work.  (D.I. 9-3 at 18)  On February 22, 2017, Hinson started seeing Mr. Timothy J. Toole ("Mr. Toole"),[8] who noted that Hinson experiences trust issues, depression, difficulty concentrating, decreased energy, anhedonia, general anxiety in social settings, and anticipatory fear.  (D.I. 9-9 at 31-32)  Mr. Toole observed that Hinson was cooperative, had good common sense and impulse control, and exhibited fair insight.  (*Id.* at 36) Hinson was alert, oriented, and had intact attention and memory.  (*Id.*)  Hinson stated that she was afraid of taking her medicine.[9]  (*Id.* at 34)  She continued to receive treatment from Mr. Toole from February 2017 through August 2018, and consistently described sleep disturbances, post-traumatic stress disorder ("PTSD") symptoms, dysthymic and anxious mood, and good memory and fund of knowledge.  (*Id.* at 23-31)

On August 19, 2017, Hinson visited the emergency department at Christiana Care.  (D.I. 9-13 at 16-17, 75)  She reported suicidal thoughts, difficulty sleeping, and loss of appetite.  (*Id.* at 17)  She was pleasant, cooperative, guarded, alert, and oriented to time, place, and person. (*Id.*)  She had a coherent thought process and thought content, despite her anxious and depressed mood.  (*Id.*)  Her attention span, concentration, and memory were grossly intact, her judgment was impaired, and her insight was poor.  (*Id.*)  While at Christiana Care, Dr. Julie J. Cooper ("Dr. Cooper") noted that despite being prescribed three mental health medications, Hinson had

---

[7] Dr. Siegel is a state agency medical consultant.  (D.I. 9-3 at 11-19)

[8] Mr. Toole is a licensed clinical social worker, who provided treatment for Hinson from February 2017 through August 2018.  (D.I. 9-9 at 23-31)

[9] Claimant previously reported to Dr. Kurz that she discontinued use of medication because of undesirable side effects.  (*See* D.I. 9-2 at 28)  Subsequently, when she received in-patient treatment at the Rockford Center, she admitted not taking her medications due to concerns over addiction problems in her family.  (*See id.*)

refused to take them for months.  (D.I. 9-14 at 13)  Hinson was referred to Rockford Center's Intensive Outpatient Program.  (D.I. 9-13 at 76)

In an August 21, 2017 Rockford Center initial intake assessment, Hinson stated that she was depressed and experiencing weekly panic attacks.  (D.I. 9-17 at 17)  She exhibited a normal thought process, depressed mood, flat affect, average fund of knowledge, normal abstraction, fair insight and judgment, and an ability to perform activities of daily living.  (*Id.* at 26)  Hinson described a fear of taking medications, flashbacks and nightmares, and increased depression, anxiety, and paranoia.  (*Id.* at 29)  An admission note from the same day noted a failure of treatment and failure of social or occupational functioning.  (*Id.* at 18)  Furthermore, Hinson exhibited an impaired mood, depression, mood swings, and suicidal ideation.  (*Id.*)  On the next day, Hinson received a psychiatric evaluation, which found her largely cooperative despite her anxiety, depression, and irritability.  (*Id.* at 15-16)  She had a linear and goal-oriented thought process without suicidal ideation or paranoia.  (*Id.* at 16)  She had fair attention, memory, and abstraction, improving insight and judgment, and fair capacity for activities of daily living.  (*Id.* at 16-17)

A September 5, 2017 Rockford Center psychiatric progress note described Hinson as cooperative with a flat affect and anxious and depressed mood.  (D.I. 9-18 at 10)  She had a goal-oriented thought form and was concerned about the side effects of her prescribed medication, which she had not yet taken.  (*Id.*)  Hinson was discharged on September 12, 2017, and a discharge summary from the same day noted that Hinson remained afraid to take medication and had poor medication compliance, though she indicated that she would start trying to take her medication.  (D.I. 9-17 at 3, 5, 14)  She was found to be stable, cooperative, optimistic, and future oriented with a euthymic mood, normal thought process, and normal thought content.  (*Id.*

at 5-6)  She had fair and improving insight, judgment, and a capacity for activities of daily living.
(*Id.* at 4, 6)  On October 6, 2017, Mr. Toole noted that he picked up Hinson due to her
psychiatric condition and fear of public places.  (D.I. 9-7 at 19)

On February 23, 2018, Hinson visited Dr. Salandanan, who acknowledged her
improvement and her work on regulating her mood.  (D.I. 9-10 at 42)  On March 16, 2018, she
returned to Dr. Salandanan and processed emotions regarding social withdrawal.  (*Id.* at 43)  On
April 27, 2018, she visited Dr. Gavis, who noted that she was depressed, but cooperative and
oriented to time, place, purpose, and person.  (D.I. 9-8 at 3)

### c.  Hearing Before ALJ Reeves

#### i.  Hinson's Testimony

Hinson testified that after an incident involving harassment at work, she has not worked
and developed depression, anxiety, phobias, and paranoia.  (D.I. 9-2 at 45-46)  With regard to her
depression, Hinson stated that she cries regularly and has difficulty sleeping.  (*Id.* at 46)  She
experiences racing thoughts that make it difficult for her to sleep.  (*Id.* at 46-47)  She experiences
nightmares three times per week and, on average, sleeps for four hours each night.  (*Id.* at 47)
As a result, she is very tired, does not want to be around people, and lacks energy to perform
chores.  (*Id.* at 48)  Hinson testified that her anxiety prevents her from being around or trusting
people.  (*Id.*)  She has an anxiety attack or panic attack once or twice per week.  (*Id.* 48-49)
Social situations and stressful situations aggravate her symptoms of anxiety.  (*Id.* at 49)  She
described experiencing irrational, violent, and "scary" thoughts.  (*Id.* at 51)  Specifically, Hinson
sometimes thinks that people are watching her and that her dogs are helping her live.  (*Id.* at 52)

Hinson lives with her daughter.  (*Id.* at 50)  She tries to wash, cook, and clean her house.
(*Id.* at 51)  Hinson stated that she feels unable to work full time or leave her house.  (*Id.* at 49)

She testified that a friend ordinarily accompanies her to the store and that she has avoided taking

public transportation due to her anxiety.  (*Id.* at 48)  She attends church once per month.  (*Id.* at

53)  She stays at home and regularly walks her dogs.  (*Id.* at 54)

### ii.  Vocational Expert Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

[T]his hypothetical will be non-exertional only.  The individual can tolerate
occasional changes in the work place, occasional interaction with coworkers,
supervisors and the public and they would be off task five percent of the work
day.  Could this hypothetical individual perform the past work?

(*Id.* at 56)  The VE testified that this individual would not be able to perform claimant's past

work as a "station agent II" at the light exertional level because the interaction with supervisors,

the public, and coworkers would preclude employment.  (*Id.*)  The ALJ inquired whether there

was any other work that the hypothetical individual could perform.  (*Id.*)  The VE testified that

the hypothetical individual could perform work as a bottling line attendant at the light exertional

level, a machine packager at the medium exertional level, or a laundry worker at the medium

exertional level.  (*Id.* at 56-57)  The ALJ asked whether a limitation of occasional interaction

with coworkers and supervisors, but no interaction with the public would change the VE's

response.  (*Id.* at 57)  The VE testified that this limitation would not change her response.  (*Id.*)

The ALJ asked whether a limitation of no interaction with the public and coworkers and

occasional interaction with supervisors would change the VE's response.  (*Id.*)  The VE testified

that this limitation would not change her response.  (*Id.*)  The VE noted that the interaction with

the public is not addressed in the Dictionary of Occupational Titles ("DOT") and that she relied

on her twenty-five years of experience and observation of jobs being performed.  (*Id.* at 58)

Hinson's attorney asked whether the individual would be able to perform work as a

bottling line attendant, machine packager, or laundry worker if the individual was off task fifteen

percent of the workday or would miss at least two days of work per month.  (*Id.*)  The VE

testified that the DOT does not address time off task or absenteeism but, based on her

experience, if the individual was absent more than one day per month or off task fifteen percent

or more, competitive work would be precluded.  (*Id.*)

### d.  The ALJ's Findings

Based on the factual evidence in the record and the testimony by Hinson and the VE, the

ALJ determined that Hinson was not disabled under the Social Security Act for the relevant time

period of December 10, 2015, the alleged onset date of the disability, through November 21,

2018, the date of the ALJ's decision.  (*Id.* at 32)  The ALJ found in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since December 10, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments:  depression and anxiety (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  The claimant can tolerate occasional changes in the work place, occasional interaction with supervisors, and no interaction with the public and co-workers.  Further, the claimant will be off task five percent of the workday.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 7, 1963 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 10, 2015, through the date of this decision (20 CFR 404.1520(g)).

(*Id.* at 25-32)

## III.   STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record.  *See id.*  In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence.  *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)).  As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted); *Biestek*, 139 S. Ct. at 1154.

Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."  *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'"  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).  "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing."  *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

**IV.   DISCUSSION**

**a.  Disability Determination Process**

The core issue in this case is whether Hinson was disabled within the meaning of the Act at any time from December 10, 2015, the alleged onset date of the disability, through November 21, 2018, the date of the ALJ's decision.  (D.I. 9-2 at 32)  Title II of the Social Security Act

affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the

13

Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work.  *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428.  When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five.  *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the RFC to perform his past relevant work.  *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428.  A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).  The claimant bears the burden of demonstrating the inability to return to past relevant work.  *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428.  In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the VE's assistance in making this finding.  *See id.*

**b.  Whether the ALJ's Decision is Supported by Substantial Evidence**

On November 21, 2018, the ALJ found that Hinson was not disabled from the alleged

disability onset date of December 10, 2015, through the date of the ALJ's decision.  (D.I. 9-2 at

32)  The ALJ concluded that, despite Hinson's severe impairments (depression and anxiety),

Hinson had the RFC to perform work at all exertional levels with the following limitations:

occasional changes in the work place, occasional interaction with supervisors, and no interaction

with the public and co-workers.  (*Id.* at 25, 27)  The ALJ determined that Hinson was not capable

of performing past relevant work.  (*Id.* at 30)  Hinson asserts three main arguments on appeal:

(1) the ALJ failed to provide adequate reasons for affording the medical opinions of Dr.

Salandanan, Dr. Kurz, and Mr. Toole only "some weight" and the ALJ's RFC finding was

therefore inaccurate; (2) the ALJ erred when he failed to recontact Hinson's treating sources; and

(3) the ALJ's credibility assessment of Hinson is flawed because the ALJ failed to consider

plaintiff's lengthy work history.  (D.I. 13 at 3-17)

**i.  Medical Opinion Evidence**

Hinson argues that the ALJ erred by failing to provide adequate reasons for assigning

only "some weight" to the opinions of Dr. Kurz, Dr. Salandanan, and Mr. Toole.  (*Id.* at 3-15)

Specifically, Hinson contends that the ALJ failed to evaluate the medical opinions pursuant to 20

C.F.R. § 404.1527(c).  (*Id.* at 3-4, 7-15)  These factors include:  examining relationship,

treatment relationship, supportability, consistency, specialization, and other factors such as the

extent to which the medical source is familiar with other information in the case.  *See* 20 C.F.R.

§ 404.1527(c).

Although the findings and opinions of treating physicians are entitled to substantial

weight, "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on

the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir.

2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)).  Instead, the

determination of RFC and disabilities are issues reserved for the Commissioner.  *See* 20 C.F.R. §

416.927(d)(2).  Moreover, "[a] treating source's opinion is not entitled to controlling weight if it

is 'inconsistent with other substantial evidence in [the] case record.'"  *See Scouten v. Comm'r of*

*Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)).  It is not

for the court to re-weigh the medical opinions in the record, but rather to "determine whether

substantial evidence exists to support the ALJ's weighing of those opinions."  *Ransom v.*

*Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing

*Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

       "[A]n ALJ need not explicitly discuss each [20 C.F.R. § 404.1527(c)] factor in his

decision . . . .  Instead, an ALJ need only explain his evaluation of the medical evidence for the

district court to meaningfully review whether his reasoning accords with the regulation's

standards."  *Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018)

(internal quotation marks and citations omitted).  Here, the ALJ considered all relevant factors in

determining how much weight to afford the opinions of Dr. Kurz, Dr. Salandanan, and Mr.

Toole.  The ALJ explained that Dr. Kurz's opinion should be afforded "some weight" because

his opinion was inconsistent with other evidence of record.  (D.I. 9-2 at 29)  The ALJ noted that

Dr. Kurz completed a consultative examination and opined that Hinson had moderately severe

limitations in relating to other people, sustaining work performance and attendance, and coping

with the pressures of ordinary work.  (*Id.*)  However, the ALJ noted that Dr. Kurz's

psychological functional capacities evaluation form was inconsistent with the record.  (*Id.*)  For

example, the record illustrates Hinson's consistently good memory and concentration and fair

insight and judgment.  (D.I. 9-7 at 13; D.I. 9-9 at 23-31; D.I. 9-10 at 54; D.I. 9-13 at 17; D.I. 9-16 at 23; D.I. 9-17 at 16-17)

As to Dr. Salandanan, the ALJ found that she did not provide any express limitations on Hinson's functioning and her opinion was inconsistent with the evidence of record and, therefore, assigned her opinion "some weight."  (D.I. 9-2 at 28-30)  The ALJ noted that Dr. Salandanan's treatment notes stated that Hinson was pleasant, cooperative, guarded, and fully oriented.  (*Id.* at 28-29)  She had a good general fund of information, good abstract reasoning ability, normal thought process, normal attention, and normal concentration.  (*Id.*; D.I. 9-7 at 13; D.I. 9-9 at 23-31; D.I. 9-10 at 54; D.I. 9-13 at 17; D.I. 9-16 at 23; D.I. 9-17 at 16-17)

The ALJ also assigned "some weight" to the opinion of Mr. Toole because, despite Mr. Toole not providing an express limitation on Hinson's functioning, his opinion was inconsistent with the evidence of record.  (D.I. 9-2 at 29-30)  The ALJ acknowledged that Hinson required a higher level of service other than transportation, such as being picked up at her home due to her fear of public places.  (*Id.* at 30)  The ALJ stated that he incorporated Hinson's fear of public places and returning to work into the RFC.  (*Id.*)  Furthermore, the ALJ noted that Hinson consistently exhibited intact abstract reasoning, fund of knowledge, and memory.  (*Id.*; D.I. 9-7 at 13; D.I. 9-9 at 23-31; D.I. 9-10 at 54; D.I. 9-13 at 17; D.I. 9-16 at 23; D.I. 9-17 at 16-17)  Moreover, she had fair insight and judgment and good impulse control and concentration.  (D.I. 9-7 at 13; D.I. 9-9 at 23-31; D.I. 9-10 at 54; D.I. 9-13 at 17; D.I. 9-16 at 23; D.I. 9-17 at 16-17)

Hinson asserts that a medical opinion need not be "free of any doubt [or] 100% consistent" and that, viewed in this light, the opinions of her treating sources are not inconsistent with the treatment records.  (D.I. 13 at 8-9)  Hinson cites SSR 96-2p to support this assertion.  (*Id.*)  However, SSR 96-2p states:  "a well-supported treating source medical opinion need not be

supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) *as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion*." SSR 96-2p (emphasis added). Hinson cites no legal authority to support her assertion that several allegedly inconsistent medical opinions, read together, leads to the conclusion of consistency within the record. (D.I. 13 at 8-9) Here, as outlined above, substantial evidence supports the ALJ's determination that the medical opinions of Dr. Kurz, Dr. Salandanan, and Mr. Toole were inconsistent with evidence of record.

Moreover, Hinson suggests that the ALJ impermissibly relied on his own lay judgment to discredit the opinions of her treating medical sources. (*Id.* at 15) If an ALJ chooses to reject the treating physician's assessment, they may do so only on the "basis of contradictory medical evidence" not because of his or her "own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Further, "an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments," but that does not "override the medical opinion of a treating physician that is supported by the record." *Id.* at 318.

The ALJ did not substitute his lay opinion for the opinions of Dr. Kurz, Dr. Salandanan, and Mr. Toole, but rather afforded their opinions some weight because of inconsistencies with the evidence in the record. Thus, substantial evidence supports the ALJ's evaluations of the opinions of Dr. Kurz, Dr. Salandanan, and Mr. Toole.

### ii.  Recontacting Medical Sources

Hinson argues that the ALJ erred when he failed to recontact Hinson's treating

medication sources for "clarification," pursuant to 20 C.F.R. §§ 404.1520b(b) and 404.1519p(b).

(D.I. 13 at 15)

20 C.F.R. § 404.1520b(b) states that "[i]f the evidence is *consistent* but we have

*insufficient* evidence to determine whether you are disabled, or if after considering the evidence

we determine we cannot reach a conclusion about whether you are disabled . . . [w]e *may*

recontact your medical source."  20 C.F.R. § 404.1520b(b)(2) (emphasis added).  In the case of

inconsistencies in the case record, "we will consider the relevant evidence and see if we can

determine whether you are disabled based on the evidence we have."  20 C.F.R. §

404.1520b(b)(1).

Here, the ALJ weighed the inconsistent medical opinions of Dr. Kurz, Dr. Salandanan,

and Mr. Toole against other substantial evidence in the record.  (D.I. 9-2 at 27-30)  The ALJ

consequently afforded these opinions some weight based on inconsistency with the record.  (*Id.*)

Because the evidence was sufficient but inconsistent, the ALJ was required to weigh the

evidence presented.  *See Campbell v. Colvin*, 2016 WL 4503341, at *3 (W.D. Pa. Aug. 29, 2016)

("An ALJ may only consider recontacting a treating physician, where the evidence is consistent

but there is insufficient evidence to determine whether a claimant is disabled or after weighing

the evidence the ALJ cannot reach a conclusion about whether a claimant is disabled.  The ALJ,

however, is not obligated to do so.") (internal citations omitted).  Furthermore, even if 20 C.F.R.

§ 404.1520b(b)(2) were applicable, the ALJ is not required to recontact medical sources but such

action is discretionary.  *See id.*  Moreover, "[w]hen an ALJ does not express 'confusion' about a

treating source statement, but, instead, concludes that it lacks proper support, there is no reason

to recontact the physician." *Vargas v. Berryhill*, 2018 WL 1938312, at *7 (M.D. Pa. Mar. 13, 2018) (citing *Ross v. Colvin*, 2015 WL 1636132, at *9 n.4 (M.D. Pa. Apr. 8, 2015)).

Furthermore, 20 C.F.R. § 404.1519p(b) states that "[i]f the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." 20 C.F.R. § 404.1519p(b). "[T]he ALJ only need recontact the medical source when the evidence received from the medical source is inadequate to determine whether or not the claimant is disabled, not because the ALJ finds the doctor's opinion inconsistent with the claimant's medical records." *Gladden o/b/o Hyman-Self v. Berryhill*, 2018 WL 1123763, at *6 (E.D. Pa. Feb. 28, 2018) (internal quotation marks omitted) (quoting *Kelly v. Colvin*, C.A. No. 09-759-RGA-SRF, 2013 WL 5273814, at *16 (D. Del. Sept. 18, 2013)). Here, Hinson has not identified an absence of evidence in the record that indicates a need to recontact any medical sources. (D.I. 13) The ALJ's determination that the record was sufficient to establish that Hinson was not disabled without the need for further explanation from medical sources was supported by substantial evidence, as discussed in section (IV)(b)(i), *supra*.

Therefore, the ALJ did not err in failing to recontact any of Hinson's treating sources.

### iii. Hinson's Work History

Hinson argues that the ALJ did not adequately consider her long work history when assessing her credibility. (D.I. 13 at 16-17) Hinson states that her twenty-one years of uninterrupted earnings and thirty-eight years of employment bolster her credibility. (*Id.*) 20 C.F.R. § 404.1529(c)(3) lists several factors that the ALJ may consider when evaluating the intensity and persistence of plaintiff's symptoms, including: "information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and

observations by our employees and other persons."  20 C.F.R. § 404.1529(c)(3).  The Third Circuit has held that an individual may be entitled to consideration of their long work history in the assessment of their credibility of symptoms.  *See Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979).  However, an ALJ is "not required to equate a long work history with enhanced credibility," particularly if the claimed symptoms do not match the evidence of record.  *Passaretti v. Colvin*, 2015 WL 5697510, at *10 (M.D. Pa. Sept. 24, 2015) (citing *Birtig v. Colvin*, 2014 WL 5410645, at *10 (W.D. Pa. Oct. 23, 2014)).

Here, the ALJ did not err in failing to expressly consider Hinson's extensive work history because he concluded that Hinson's complaints did not match the evidence of record.  (D.I. 9-2 at 30)  *See Passaretti*, 2015 WL 5697510, at *10; *Corley v. Barnhart*, 102 F. App'x 752, 755 (3d Cir. 2004) (ALJ did not err by failing to factor in plaintiff's long work history); *Skrbin v. Colvin*, 2016 WL 5390140, at * (W.D. Pa. Sept. 26, 2016) ("A long work history in and of itself is insufficient to overcome the substantial evidence supporting the ALJ's credibility determination, thus remand is not warranted.").  The ALJ's decision indicates that he was aware of plaintiff's work history, as he acknowledged her work as a station agent for the New York City Transit.  (*Id.* at 28, 30)  The ALJ observed that evidence of record shows intact abstract reasoning, fund of knowledge, and working memory, in addition to fair insight and judgment, good impulse control, good concentration, and good memory.  (D.I. 9-2 at 30)  Furthermore, the ALJ noted that Hinson did not take her medications as prescribed.  (*Id.* at 29)  Thus, the ALJ did not err in failing to find Hinson deserved "enhanced credibility" based on her work record.

## V.    CONCLUSION

For the foregoing reasons, Hinson's motion for summary judgment is denied (D.I. 12),

and the Commissioner's cross-motion for summary judgment is granted (D.I. 15).  An Order

consistent with this Memorandum Opinion shall issue.


Dated:  November 9, 2020                              _____
                                                     Sherry R. Fallon
                                                     United States Magistrate Judge